No. 13-15227

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DRAKES BAY OYSTER COMPANY and KEVIN LUNNY,
Plaintiff-Appellants,

v.

KENNETH L. SALAZAR, in his official capacity as Secretary,
U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR;
U.S. NATIONAL PARK SERVICE; and JONATHAN JARVIS, in his official
capacity as Director, U.S. National Park Service,

Defendant-Appellees.

-------------------------------------------------

On Appeal from the United States District Court
for the Northern District of California
(Hon. Yvonne Gonzales Rogers, Presiding)
District Court Case No. 12-cv-06134-YGR

-------------------------------------------------

## APPELLANTS' OPENING BRIEF

## ON PRELIMINARY INJUNCTION APPEAL

Amber D. Abbasi
CAUSE OF ACTION
1919 Pennsylvania Ave. NW, Suite 650
Washington, D.C. 20006
Phone: 202.499.4232

*Attorney for Plaintiff-Appellants*
*Additional Counsel on the following*
*pages*

John Briscoe
Lawrence S. Bazel
Peter S. Prows
BRISCOE IVESTER & BAZEL LLP
155 Sansome Street, Suite 700
San Francisco, CA 94104
Phone: 415.402.2700

Zachary Walton
SSL LAW FIRM LLP
575 Market Street, Suite 2700
San Francisco, CA 94105
Phone:  415.243.2685

S. Wayne Rosenbaum
Ryan Waterman
STOEL RIVES LLP
12255 El Camino Real, Suite 100
San Diego, CA 92130
Phone: 858.794.4100

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellant Drakes Bay Oyster Company has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................1

II.   JURISDICTIONAL STATEMENT ...................................................3

III.  STATEMENT OF THE ISSUES........................................................3

IV.   STATUTES AND REGULATIONS ...................................................4

V.    STATEMENT OF THE CASE............................................................4

VI.   STATEMENT OF FACTS ...................................................................6

VII.  SUMMARY OF ARGUMENT ..........................................................14

VIII. STANDARD OF REVIEW ................................................................15

IX.   ARGUMENT ......................................................................................16

   A.   The District Court Erred When It Concluded That It Did Not
        Have Jurisdiction To Review The Challenged Agency Action. .........18

      1.   Section 124 Was Designed To Make It Easy To Issue The
           Permit, Not To Exempt A Permit Denial From Judicial
           Review. .....................................................................................19

      2.   There Is Jurisdiction Because There Are Laws And
           Meaningful Standards To Apply To The Decision. ....................20

   B.   DBOC Is Likely To Prevail On The Merits. .......................................24

      1.   Defendants' Decision Was Based On Four Misinterpretations
           Of Law, In Violation Of The APA. ............................................25

      2.   Defendants Violated NEPA. ......................................................29

      3.   Defendants Illegally Published A False Federal Register
           Notice. ......................................................................................31

   C.   DBOC Will Suffer Irreparable Harm Without An Injunction. ...........33

   D.   The Balance Of Equities And Public Interest Favor An
        Injunction, And The District Court Erred When It Concluded
        Otherwise..............................................................................................34

X.    CONCLUSION ..................................................................................37

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ..........................................................................36

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................... 6, 17

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ........................................................34

*Ass'n to Protect Hammersley v. Taylor Res., Inc.*,
299 F.3d 1007 (9th Cir. 2002) ........................................................28

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994)...........................................................26

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986)................................................................. 18, 21

*Cadence Design Sys. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997)...........................................................38

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
131 S. Ct. 1101 (2011) ....................................................................21

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004)........................................................................20

*Ft. Funston Dog Walkers et al. v. Babbitt*,
96 F. Supp. 2d 1021 (N.D. Cal. 2000) ......................................... 22, 33

*Gen. Chem. Corp. v. United States*,
817 F.2d 844 (D.C. Cir. 1987) ........................................................26

*Heckler v. Chaney*,
470 U.S. 821 (1985)........................................................................21

*In re Glacier Bay*,
944 F.2d 577 (9th Cir. 1991)...........................................................24

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
2013 U.S.App.LEXIS 3887 (9th Cir. Feb. 25, 2013) ................... 16, 18

*KOLA, Inc. v. United States*,
882 F.2d 361 (9th Cir. 1989)...........................................................22

*Kucana v. Holder*,
130 S. Ct. 827 (2010) ......................................................................18

*Mejia-Hernandez v. Holder*,
633 F.3d 818 (9th Cir. 2011)...........................................................18

*Meyer v. Portfolio Recovery Assocs., LLC*,
2012 U.S. App. LEXIS 26708 (9th Cir. 2012) ................................16

*Montana Wilderness Assoc. v. U.S. Forest Service*,
655 F.2d 951 (9th Cir. 1981)...........................................................24

*Motor Vessels Theresa Ann v. Kreps*,
   548 F.2d 1382 (9th Cir. 1977) ............................................................35

*Natural Res. Def. Council v. U.S. Forest Service*,
   421 F.3d 797 (9th Cir. 2005)..............................................................32

*Ness Inv. Corp. v. U.S. Dep't. of Agric.*,
   512 F.2d 706 (9th Cir. 1975).........................................................22, 23

*Newman v. Apfel*,
   223 F.3d 937 (9th Cir. 2000)..............................................................21

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................17

*NRDC v. U.S. Forest Service*,
   421 F.3d 797 (9th Cir. 2005).........................................................30, 31

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2010) ............................................................30

*Pac. Rivers Council v. U.S. Forest Serv.*,
   689 F.3d 1012 (9th Cir. 2012) ............................................................22

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
   636 F.3d 1150 (9th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011)............ 34, 37

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991)..............................................................34

*S. Fork Band Council of W. Shoshone v. DOI*,
   588 F.3d 718 (9th Cir. 2009)........................................................31, 36

*Sanchez v. City of Santa Ana*,
   936 F.2d 1027 (9th Cir. 1990) .......................................................16, 35

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
   444 U.S. 572 (1980)............................................................................24

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943)..............................................................................25

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ............................................................35

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)..............................................................34

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009) ............................................................16

*United States v. Novak*,
   476 F.3d 1041 (9th Cir. 2007) ............................................................23

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011)..............................................................32

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008)................................................................................17

iv

## Statutes

16 U.S.C. § 1131 ....................................................................8

16 U.S.C. § 1131(c) ..............................................................28

16 U.S.C. § 2801(b)–(c) (2012) ...........................................36

16 U.S.C. § 459c-5(a) ..................................................... 28, 36

16 U.S.C. § 459c-5(b) ..................................................... 28, 36

1965 Cal. Stat. Ch. 983 .........................................................6

28 U.S.C. § 1292(a)(1) ...........................................................3

28 U.S.C. § 1331 ...................................................................3

5 U.S.C. § 551 ......................................................................3

5 U.S.C. § 701(a)(2) ......................................................... 3, 18

5 U.S.C. § 702 ......................................................................3

5 U.S.C. § 704 ......................................................................3

5 U.S.C. § 706(2)(A) ...................................................... 22, 25

Cal. Pub. Res. Code § 30100.2 .............................................28

42 U.S.C. §§ 4321 et seq. ("NEPA") ....................................15

Pub. L. No. 111-88 § 124 ............................................. passim

Pub. L. No. 94-544 ................................................................8

Pub. L. No. 94-567 ......................................................... 8, 27

Pub. L. No. 95-625 § 318 (1978) ("The 1978 Act") ..............15

16 U.S.C. § 2801 et seq. ("The National Aquaculture Act") ...15

## Regulations

36 C.F.R. § 1.5(b) ........................................................ 22, 33

36 C.F.R. § 1.6 ...................................................................22

40 C.F.R. § 1500.1(b) ..........................................................32

40 C.F.R. § 1506.10(b)(2) ....................................................30

40 C.F.R. § 1506.9 ......................................................... 11, 30

## Other Authorities

75 Fed. Reg. 65,373 (Oct. 22, 2010) ....................................10

77 Fed. Reg. at 71,826, 71,827 (Dec. 4, 2012) ................ 13, 33

1976 U.S.C.C.A.N. 5593 .......................................................8

Fed. R. App. Proc. R. 4(a)(1)(A) ...........................................3

Felicity Barringer, *A Park, an Oyster Farm, and Science: Epilogue*, N.Y. TIMES GREEN BLOG, http://green.blogs.nytimes.com/2012/12/04/a-park-an-oyster-farm-and-science-epilogue/ (last visited Feb. 12, 2013) ............................................12

H.R. Rep. No. 112-331 ................................................................................ 10, 24

H.R. Rep. No. 94-1680 .......................................................................................8

*Ranching History at Point Reyes*, NATIONAL PARK SERVICE,
    http://www.nps.gov/pore/historyculture/people_ranching.htm (last visited Mar.
    4, 2013) .........................................................................................................6

## I.     INTRODUCTION

Appellants Drakes Bay Oyster Company and Kevin Lunny ("DBOC") challenge the decision by the Secretary of the Interior and his co-Defendant-Appellees ("Defendants") to deny DBOC a permit to continue an 80-year tradition of oyster farming in Drakes Estero, California.[1]

In making that decision, Defendants did three things that Congress told them *not* to do. First, the Secretary violated a special statute, Pub. L. No. 111-88 § 124, ("Section 124"), the undisputed purpose of which was to make it easy for Defendants to issue the permit, not to deny it. Section 124 told the Secretary that he was "authorized to issue" the permit "notwithstanding any other provision of law." But when he denied the permit based on the very rationale that Section 124 prohibited—that issuing the permit would "violate" the law—the Secretary contravened Section 124.

Second, Congress told Defendants not to redesignate Drakes Estero from "potential wilderness" to "wilderness" until all nonconforming uses had been eliminated. But Defendants redesignated Drakes Estero as wilderness before eliminating nonconforming uses. Rights retained by the State of California allow it to continue leasing the estero for oyster farming in perpetuity, and even to dredge the estero for sand and other minerals at any time.

---

[1]  Other Defendants include the Department of the Interior; Jonathan Jarvis, Director of the National Park Service, in his official capacity; and the National Park Service.

Third, Congress directed Defendants to ensure a "solid scientific foundation" before any permit denial because it had substantial concerns about the "validity of the science" Defendants proffered in attempts to show that the oyster farm causes environmental harm. But Defendants have not ensured a solid scientific foundation for their denial of the permit. Instead, they have fielded misleading and inaccurate data that compares the skiffs and equipment at a small farm to cement mixers and police boats and invents disturbances to nearby seal populations out of whole cloth. The Secretary's decision dismissed as mere difference of opinion the substantial criticisms of Defendants' scientific assessments—many of which came from the National Academy of Sciences— insisting in one place that it did not rely on data identified as flawed, while in another asserting as true a conclusion based on those same flawed data.

DBOC alleged that Defendants' actions violated federal law and sought a preliminary injunction to maintain the status quo and prevent the closure of the oyster farm during its case. The district court wrongly denied the motion for preliminary injunction, finding that this case fit a "narrow" exception to judicial review for agency actions "committed to agency discretion by law" under the Administrative Procedure Act (APA), even though established case law holds that there is a "strong presumption" that agency action is judicially reviewable under the APA and that Defendants must meet a "heavy burden" of proving otherwise.

Absent injunctive relief, the Secretary's decision will result in the permanent closure of a family-owned farm, layoffs of its thirty-one full-time employees, and the destruction of over twenty million shellfish growing in the waters of Drakes

Estero. On February 25, 2013, three days before the National Park Service ("NPS") would have forced DBOC to close, this Court issued an injunction pending appeal, finding that this case presents "serious legal questions and the balance of hardships tips sharply in [DBOC's] favor." This Court should reverse the district court's order and maintain the injunction.

## II.    JURISDICTIONAL STATEMENT

DBOC challenged the decision by Defendants to deny DBOC's application for a special use permit ("SUP"), which is a final agency action reviewable under 5 U.S.C. § 704. This case arises under, *inter alia*, the APA, 5 U.S.C. § 551 *et seq.*; the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; and Section 124, Pub. L. No. 111-88 § 124. The district court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

This is an appeal from the district court's February 4, 2013 order (hereinafter "Order") denying DBOC's motion for a preliminary injunction to enjoin Defendants from implementing their decision. This Court has subject-matter jurisdiction to review the Order, an immediately appealable interlocutory order, under 28 U.S.C. § 1292(a)(1). On February 6, 2013, within 30 days of the entry of the Order, DBOC timely filed a notice of preliminary injunction appeal as required by Fed. R. App. Proc. R. 4(a)(1)(A).

## III.    STATEMENT OF THE ISSUES

1. Whether the district court reversibly erred when it ruled that it lacked jurisdiction to review the Secretary's decision to deny DBOC a SUP on the ground that that decision was exempted from judicial review under Section § 701(a)(2) of

the APA as a decision "committed to agency discretion by law." This issue was raised and ruled on in the district court's Order (Excerpts of Record "ER" 0030).

2. Whether the district court reversibly erred when it ruled that DBOC had not shown that it was likely to succeed on the merits and therefore was not entitled to preliminary injunctive relief. This issue was raised and ruled on in the district court's Order. ER 0038-39.

3. Whether the district court reversibly erred when it ruled that the balance of equities and public interest did not weigh in favor of preliminary injunctive relief. This issue was raised and ruled on in the district court's Order. ER 0044.

This Court's review of these issues is de novo. *See* Section VIII, below.

## IV.    STATUTES AND REGULATIONS

The relevant statutory provisions and regulations are set forth in Appellants' Addendum I.

## V.    STATEMENT OF THE CASE

Pursuant to federal law, DBOC applied for a ten-year SUP to allow it to continue farming oysters in its historic location. *See* ER 0021. Interior Secretary Salazar denied that application in a memorandum of decision ("Decision") issued on November 29, 2012, stating that DBOC would not receive a SUP and would have to shut down. ER 0118-19. On December 3, 2012, DBOC filed this action in the U.S. District Court for the Northern District of California, challenging the Secretary's decision and related conduct by NPS. ER 0647. On December 12, 2012, DBOC filed a motion for a temporary restraining order, which was withdrawn when Defendants stipulated, and the district court ordered, that DBOC

4

could continue specified operations while DBOC's motion for a preliminary injunction was briefed and decided. ER 0643-46.

On December 21, 2012, DBOC filed its motion for a preliminary injunction ("Motion"), seeking to preserve the status quo operations of DBOC's oyster farm until the merits of the case are decided. ER 0015. On January 25, 2013, the district court heard oral argument and took the matter under submission. ER 0016.

On February 4, 2013, the district court issued its Order denying the Motion, concluding that it lacked jurisdiction and that some of the requirements for injunctive relief were not met. ER 0016. The district court did find, however, that Defendants' denial of the SUP constituted agency action and that DBOC would suffer irreparable harm without injunctive relief. ER 0041.

On February 6, DBOC filed a notice of appeal from the order denying its Motion. ER 0150-51. One day later, DBOC filed a motion in the district court for an expedited ruling on a motion for injunction pending appeal. ER 0133-49. On February 8, Defendants filed an opposition thereto, while stating that they did not oppose DBOC's request for an expedited ruling. ER 0131-32. On February 11, the district court denied DBOC's motion for an injunction pending appeal. ER 001.

On February 12, DBOC filed an emergency motion for an injunction pending appeal in this Court, seeking to enjoin Defendants from interfering with the continuing operations of DBOC's oyster farm until DBOC's appeal of the Order is decided. ER 0129-30. On February 25, this Court issued an order granting the emergency motion "because there are serious legal questions and the balance of

hardships tips sharply in appellants' favor. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011)." ER 0125-26.

## VI.    STATEMENT OF FACTS

Point Reyes has been a historic farming community since at least the 1850s.[2] Oyster farming began in the Drakes Estero area of Point Reyes in the early 1930s and continues to the present. ER 0019; ER 0615. DBOC is the current owner of the oyster farm in Drakes Estero. ER 0020.

In 1962, Congress established the Point Reyes National Seashore ("PRNS") as a working landscape composed of diverse uses, including historic farming. ER 0016. At the time of its creation, the federal government lacked title to much of what had been designated as PRNS, and Interior was directed to acquire the land as funds and landowners permitted. ER 0265-68. Drakes Estero and DBOC are surrounded by cattle ranches in PRNS's pastoral zone. ER 0615; ER 0172.

In 1965, the State of California conveyed the water bottoms in Drakes Estero to the federal government, while retaining its mineral and fishing rights, including the right to lease Drakes Estero for aquaculture. ER 0621-22; 1965 Cal. Stat. Ch. 983, 2604-05 (conveying Drakes Estero water bottoms to U.S. Government, but retaining fishing and mineral rights to California); ER 0619-20 (Interior Department's confirmation in 1966 that oyster farming in Drakes Estero remains

---

[2]    *Ranching History at Point Reyes*, NATIONAL PARK SERVICE, http://www.nps.gov/pore/historyculture/people_ranching.htm (last visited Mar. 4, 2013).

under California's jurisdiction). California has pledged to "continue" leasing Drakes Estero for aquaculture. ER 0617-18 (California Fish and Game Commission ("CFGC") letter stating that it "has clearly authorized" DBOC's shellfish cultivation "through at least 2029").

DBOC produces approximately one-third of the oysters grown in California. ER 0614. It is California's only oyster cannery. ER 0614. DBOC has 31 full-time employees, and it provides affordable on-site housing for 15 people—employees and their families. ER 0613. DBOC is the only agricultural operation open to the public within PRNS, and hosts over 50,000 visitors per year who come to learn about PRNS's history, aquaculture, and marine biology. ER 0613-14. DBOC is also the sole source of oyster shells used for the restoration of habitat for the Western Snowy Plover and the Least Tern, species listed as threatened or endangered under the Endangered Species Act, and the Olympia oyster in San Francisco Bay. ER 0614.

DBOC's oyster farm has two main components—one in the water, and the other on land. The oysters grow in Drakes Estero's water bottoms, which DBOC leases from the State of California under California's retained fishing rights. ER 0019. DBOC's onshore facilities prepare oyster seed for planting and house workers and their families. *Id*. These operations are carried out under a Reservation of Use and Occupancy ("RUO"): essentially a 40-year lease from the federal government that was set to expire on November 30, 2012. *Id*. A clause in the RUO provided that Defendants could issue a SUP to allow DBOC to continue operations after that date. ER 0599.

In 1976, Congress considered designating Drakes Estero as "wilderness" under the 1964 Wilderness Act, 16 U.S.C. § 1131 *et seq.*, but it decided not to do so after the Department of the Interior explained that California's retained mineral and fishing rights were "inconsistent" with wilderness:

> Commercial oyster farming operations take place in [Drakes Estero] and the reserved rights by the State on tidelands in this area make this acreage inconsistent with wilderness.

H.R. Rep. No. 94-1680, at 6, *reprinted in* 1976 U.S.C.C.A.N. 5593, 5597; ER 0017 (discussing Pub. L. Nos. 94-544 and 94-567 (together "1976 Acts")).

Congress instead designated Drakes Estero as "potential wilderness." ER 0017. Although the House Report said that "potential wilderness" areas generally should be managed "to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status," *id.*, the Senate concluded that Drakes Estero could not be designated as a wilderness until "the Federal government gains full title to these lands. . . ." ER 0237.

In 2005, however, NPS asserted that the 1964 Wilderness Act and the 1976 Acts prohibited NPS from issuing the oyster farm a new SUP when its RUO expired in 2012. ER 0020; *see also* ER 0227-30. In response, in 2009, Congress passed a law—"Section 124"—overruling NPS's position and facilitating issuance of the permit. Section 124 "authorized" the Secretary of the Interior "to issue" a SUP allowing DBOC to continue its existing operations "notwithstanding any other provision of law." Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009); *see also* ER 0270-71 ("Congress granted the Secretary the discretionary authority

contained in section 124 in response to NPS's determination that it lacked authority to allow DBOC to operate after November 30, 2012.").[3] Defendants agree that Section 124 expresses Congress's "intent to remove legal obstacles to the issuance of a new SUP." ER 0276. Section 124 provides in full:

> Prior to the expiration on November 30, 2012 of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit (''existing authorization'') within Drake's Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: *Provided*, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

---

[3] In 2008, NPS issued a SUP to DBOC for additional uses in shoreside areas, and for the first time, purported to extend its authority into Drakes Estero, essentially overlapping the State's lease areas. ER 0200-226.

In July 2010, DBOC applied for this SUP. ER 0021. NPS subsequently initiated the NEPA process.[4] In September 2011, NPS released a Draft EIS (hereinafter "DEIS") for public comment. ER 0022. In December 2011, Congress expressed concern about "the validity of the science underlying the DEIS," and directed the National Academy of Sciences ("NAS") to review it so as to ensure a "solid scientific foundation" for the Final EIS. H.R. Rep. No. 112-331, at 1057 (2011). In August 2012, the NAS issued a report on the DEIS. ER 0496-582. This NAS report determined that Defendants' scientific conclusions in seven of the eight "resource categories" reviewed had "moderate to high levels of uncertainty and, for many of these an equally reasonable alternate conclusion of a lower [environmental] impact intensity could be reached based on the available data and information." ER 0509. The NAS also found that Defendants had not adequately assessed the potentially "significant" positive effect that DBOC's oysters have on water quality. ER 0511.

DBOC also wrote to Defendants in detail about the DEIS's shortcomings. For example, they criticized Defendants' conclusion that DBOC's operations had a

---

[4] In September 2010, NPS publicly disseminated a draft NEPA schedule for assessing the environmental impacts of DBOC's request. ER 0022. In October 2010, the Interior Department, through NPS, formally began the NEPA process to analyze the environmental impacts of DBOC's request. *Id.* On October 22, 2010, "[p]ursuant to NEPA," NPS published in the Federal Register a Notice of Intent to prepare an Environmental Impact Statement for the Drakes Bay Oyster Company Special Use Permit, Point Reyes National Seashore. 75 Fed. Reg. 65,373 (Oct. 22, 2010).

"major" impact on the "soundscape." ER 0384-86. Instead of conducting any actual sound measurements in Drakes Estero, the DEIS relied on a study of high-horsepower jet skis, racing boats, and police patrols operating at full throttle off the New Jersey shore as "representative" of the noise generated by DBOC's small oyster skiffs. ER 0384-86.

On November 20, 2012—ten days before the end of DBOC's RUO—NPS posted on its website what it called a "Final" EIS (hereinafter "FEIS"). ER 0023. Although NPS had previously followed the NEPA process, the FEIS suggested that the Secretary's decision on DBOC's permit application was exempt from NEPA. ER 0121-22, quoting FEIS at 2 ("[a]lthough the Secretary's authority under Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is helpful to generally follow the procedures of NEPA"). Moreover, the FEIS did not comply with NEPA's requirements: it was never filed with EPA as required by NEPA under 40 C.F.R. § 1506.9, and as a result, EPA never published a Notice of Availability for the FEIS in the Federal Register to allow a 30-day comment period before the final decision is made, as NEPA requires.

Although NPS also did not provide the NEPA-mandated comment period for the FEIS, DBOC subsequently identified several serious scientific errors therein. ER 0291; ER 0279-80; ER 0332; ER 0187-88; ER 0155-57. For example, the FEIS assumes that DBOC's 12 volt, 1/4 horsepower plastic oyster tumbler produces noise "comparable" to a metal "cement/mortar mixer" that can be heard from almost two miles away, ER 0465, 0473—even though NPS has never taken any

on-site sound measurements of DBOC's operations, ER 0269, and DBOC's oyster tumbler can be heard only 140 feet away. ER 0401, 0417-19. DBOC also argued that the FEIS altered the findings of the NPS-contracted harbor seal expert, increasing the number of DBOC-related seal disturbances from zero to two, and claimed NPS could identify DBOC boat noise on days when DBOC boats were not operating. ER 0633, 0638-39. Defendants have not disputed any of these contentions, although they assert that the Secretary considered the scientific dispute and did not rely on allegedly defective data in making his decision. ER 0277-78. As the *New York Times* reported, "flaws identified in the science may . . . have cost the National Park Service, particularly the Point Reyes scientists and their defenders, a substantial loss of professional credibility."[5]

On November 29, 2012—the day before the expiration of DBOC's RUO—Secretary Salazar issued a "decision" to not issue DBOC the SUP. ER 0118. Even though Section 124 authorized issuance of the SUP notwithstanding any other laws, the Secretary stated that issuance "would violate . . . specific wilderness legislation," i.e., the 1976 Acts. *Id*. And he concluded that "[t]he 'notwithstanding any other provision of law' language in [Section 124] expressly exempts my decision from any substantive or procedural requirements"—including NEPA. ER 0122. Although he claimed that his decision was exempt from NEPA, the

---

[5] Felicity Barringer, *A Park, an Oyster Farm, and Science: Epilogue*, N.Y. TIMES GREEN BLOG, http://green.blogs.nytimes.com/2012/12/04/a-park-an-oyster-farm-and-science-epilogue/ (last visited Feb. 12, 2013) (cited at ER 0633).

Secretary reasoned that "the DEIS and FEIS support the proposition" that denying DBOC a SUP would benefit Drakes Estero's environment, stating that they "informed" him and were "helpful to [him] in making [his] decision." ER 0122. On the same day, NPS directed DBOC to shut down the farm by February 28, 2013. ER 0024.

On December 4, 2012, also in response to the Secretary's Decision, NPS published a Federal Register notice ("FR Notice") stating that "all uses prohibited under the Wilderness Act within Drakes Estero have ceased as of 11:59 p.m. on November 30, 2012," that "Drakes Estero is entirely in federal ownership," and that the effect of the notice was to change Drakes Estero to "designated wilderness." 77 Fed. Reg. at 71,826, 71,827 (Dec. 4, 2012). Nevertheless, California still retains the fishing and mineral rights in Drakes Estero, DBOC's maturing oysters remain in the estero, and at the time of the notice, DBOC was continuing specified operations, including planting oyster seed and harvesting mature oysters, as permitted by Defendants. ER 0602-16; ER 0643-46.

On February 4, 2013, the district court issued an Order denying DBOC's motion for a preliminary injunction. ER 0016. The district court held that Section 124 authorized the Secretary to issue DBOC a SUP, ER 0032, that DBOC would suffer irreparable harm absent injunctive relief, ER 0041, and that Defendants' decision to deny DBOC a SUP constituted agency action, ER 0026. But the Order also held that the district court lacked jurisdiction to review that action, ER 0030, and that DBOC had not established that it would prevail on the merits or that the

13

balance of equities and public interest favored issuing an injunction. ER 0038-39, 0044.

## VII.   SUMMARY OF ARGUMENT

DBOC asks that the irreparable harm found by the district court—including the destruction of DBOC's business and the forced eviction of its workers and their families—be prevented until the courts can rule on whether Defendants broke the law when they denied DBOC a permit to continue operations. The district court refused to enjoin Defendants based on the erroneous legal conclusion that it did not have jurisdiction to adjudicate DBOC's claims. It misread federal law, wrongly endowing Defendants with absolute discretion and immunity from judicial review. The district court likewise committed reversible legal error when it concluded that DBOC was not likely to prevail on the merits of its claims and that DBOC had not shown that a preliminary injunction was in the public interest.

Section 124's plain language alone makes clear that its "notwithstanding" clause was specifically intended to make it easy for the Secretary to issue a SUP. Section 124's text, structure, purpose, and legislative history provide no evidence of congressional intent to exempt the Secretary's decision to deny DBOC a SUP from "any substantive or procedural requirements" or to insulate it from review under the APA. Quite the contrary, they confirm that Congress intended the Secretary's discretion to deny DBOC a SUP to be bounded by NEPA and other applicable law.

As a result of its fundamental misinterpretation of Section 124, the district court also reversibly erred when it found that Appellants were not likely to prevail

14

on the merits, even though the Secretary's decision rested on four misinterpretations of law and thus constituted an abuse of discretion under the APA, violated NEPA, and violated applicable NPS regulations governing highly controversial decisions that change an area's use designation. Agency actions cannot be based on misconceptions of the law or factors that Congress did not intend the agency to consider. The district court misapprehended the law when it concluded otherwise.

Finally, the district court's conclusion that DBOC had not shown that the balance of equities and public interest favored an injunction is reversible error and is not entitled to deference. This Court has already found that the balance of hardships "tips sharply" in favor of DBOC. ER 0125-26. That finding is entitled to deference. In any event, the district court also erred by failing to consider the public interest as expressed in no fewer than four statutes: Section 124, the National Aquaculture Act, NEPA, and the 1978 Act. A failure to consider the public interest as reflected in federal statutes is an abuse of discretion and the public interest favors applying federal law correctly. Moreover, the balance of the equities supports preserving DBOC.

## VIII.  STANDARD OF REVIEW

A district court's order denying a preliminary injunction motion is generally reviewed for abuse of discretion. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 2013 U.S.App.LEXIS 3887, at *7 (9th Cir. Feb. 25, 2013)

15

(internal citation and quotation marks omitted). "Conclusions of law are reviewed de novo . . . ." *Meyer v. Portfolio Recovery Assocs., LLC*, 2012 U.S. App. LEXIS 26708, at *3 (9th Cir. 2012). "[I]f the district court's application of fact to law requires reference to 'the values that animate legal principles,'" review is also de novo, "as if it were a legal finding." *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (citation omitted). Because this appeal turns on the district court's conclusions of law and its application of the values that animate legal principles, review is entirely de novo.

This Court "gives deference to motions panel decisions made in the course of the same appeal." *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1032 n.3 (9th Cir. 1990). This Court should thus defer to the motions panel's finding that DBOC has raised "serious legal questions" in this appeal and that "the balance of hardships tips sharply in [DBOC's] favor." ER 0125-26.

## IX.   ARGUMENT

A preliminary injunction may issue if the plaintiff establishes four elements: "[i] that he is likely to succeed on the merits, [ii] that he is likely to suffer irreparable harm in the absence of preliminary relief, [iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The last two elements—balance of the equities and the public interest—"merge" into one where, as here, the Government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Alternatively, an injunction may issue where the balance of the equities "tips sharply" in favor of the plaintiff, and the plaintiff shows "serious questions"

16

on the merits. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation and internal quotation marks omitted).

DBOC does not contest the district court's finding that DBOC would suffer irreparable harm in the absence of an injunction. ER 0041. The district court denied DBOC's Motion on three grounds: that it lacked jurisdiction, ER 0030, that DBOC had not shown that it was likely to prevail on the merits, ER 0038-39, and that DBOC had not shown that the public interest and balance of the equities favored an injunction, ER 0044.

Those three holdings should be reversed. First, the district court misinterpreted the law when it concluded that it did not have jurisdiction to hear the case. Second, the district court misinterpreted the law when it concluded that DBOC would not prevail on the merits. Third, the district court misinterpreted the law when it balanced the equities and found that they did not favor DBOC, as demonstrated by this Court's more recent finding that the balance of hardships "tips sharply" in DBOC's favor. ER 0125-26.

Because DBOC meets all the elements for a preliminary injunction, the Order should be reversed and the injunction already issued by this Court should remain in effect pending resolution of this case on the merits. *See Inst. of Cetacean Research*, 2013 U.S.App.LEXIS 3887, at *16 (reversing district court's denial of preliminary injunction and ordering that Ninth Circuit's previously-ordered injunction "will remain in effect until further order of this court").

### A. The District Court Erred When It Concluded That It Did Not Have Jurisdiction To Review The Challenged Agency Action.

The district court has jurisdiction to review Defendants' denial of a SUP to DBOC. ER 0634; ER 0194-99; ER 0053-82. Defendants admitted that judicial review of agency action is presumptively available, but argued that this case fits a "narrow" exception under Section 701(a)(2) of the APA for agency actions that are "committed to agency discretion by law." ER 0274. Yet the district court agreed with Defendants, finding that there is no jurisdiction because "the statutory context affords complete discretion." ER 0033.

The district court's conclusion is wrong as a matter of law. There is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). "Precluding [judicial] review requires clear and convincing evidence that Congress intended to dislodge this presumption." *Mejia-Hernandez v. Holder*, 633 F.3d 818, 823 (9th Cir. 2011) (citing *Kucana v. Holder*, 130 S. Ct. 827, 839 (2010)). Moreover, it is the agency's "heavy burden" to prove judicial review is unavailable, *Bowen*, 476 U.S. at 671-72, *not* DBOC's, as the Order asserted. *See* ER 0033 ("Plaintiffs have failed to provide any evidence of Congressional intent" that the Secretary did not have complete, unreviewable discretion.). In any event, neither Section 124's plain language nor its legislative history provide clear and convincing evidence that Congress intended to cut off judicial review of a decision denying the SUP. On the contrary, they leave no doubt that Congress intended to encourage the Secretary to issue the permit, not to deny it.

18

### 1. Section 124 Was Designed To Make It Easy To Issue The Permit, Not To Exempt A Permit Denial From Judicial Review.

To begin with, the plain language of Section 124 does not immunize the Secretary from judicial review of a permit denial— it says nothing about a denial. Congress passed and the President signed Section 124 to authorize the issuance of a SUP. The operative language in Section 124 provides that "notwithstanding any other provision of law, the Secretary of the Interior is authorized *to issue* a special use permit with the same terms and conditions as the existing authorization. . . ." (emphasis added). The remaining three sentences impose conditions and limitations on the issuance of the permit. Section 124 does not say that the Secretary may "issue *or deny*" the permit notwithstanding any other provision of law. Nor is there anything providing that a denial would be insulated from judicial review. The plain language of Section 124, therefore, establishes that Congress intended to give the Secretary unfettered authority to issue the permit, subject only to some specific requirements and limitations on that issuance. The district court's conclusion that Congress intended to insulate a permit *denial* from judicial review is directly contrary to the plain language of Section 124, which encourages the Secretary to issue the permit, not to deny it.

The undisputed legislative history leaves no doubt about why Section 124's plain language is phrased as it is. Defendants had taken the position that they were prohibited by law from issuing a new SUP, ER 0020, but Congress overrode that position and authorized them to issue the permit notwithstanding those laws. Defendants agree that Section 124 expresses Congress's "intent to remove legal

obstacles to the issuance of a new SUP." ER 0276. Moreover, by specifying the terms and conditions of "the extended authorization," Congress envisaged that the permit would be issued, not that it would be denied. Congressional intent to remove obstacles to the issuance of a permit is plainly not the same as intent to preclude judicial review of a denial.

The district court noted that "Congress considered, and rejected, a mandate requiring the Secretary to extend the permit." ER 0032. But a decision to confer some discretion is not a decision to cut off judicial review. Federal courts routinely review discretionary decisions (as opposed to those that are completely committed to agency discretion). Virtually every NEPA case, for example, arises out of a discretionary decision, because NEPA does not apply to non-discretionary agency actions. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004).

The text and legislative history of Section 124, therefore, establish that it is an asymmetrical statute enacted for the oyster farm's benefit, not Defendants' benefit. Section 124 was enacted to make it easy to issue the permit, not to make it easy to deny the permit by exempting a denial from normal judicial review. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1114 (2011) ("Congress wrote the statute it wrote. . . . [A] preference for symmetry cannot trump an asymmetrical statute."). Since there is no evidence of an intent to cut off judicial review of a permit denial, the district court committed legal error by concluding otherwise.

### 2. There Is Jurisdiction Because There Are Laws And Meaningful Standards To Apply To The Decision.

The district court also found that there is no jurisdiction because Section 124 provides "no meaningful standard" to apply. ER 0033 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). But the *Heckler* exception is "very narrow." *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (citation omitted).[6] The district court was simply wrong that there are no meaningful standards to apply here and reversibly erred when it incorrectly placed the burden on DBOC to establish that the Secretary's decision is reviewable under the APA. *Bowen,* 476 U.S. at 672. Section 124, NEPA, and Defendants' regulations each provide meaningful standards for judicial review.

Section 124 itself provides a judicially cognizable standard for review. That standard prohibits the Secretary from relying on a violation of other law as a reason to justify a permit denial, since Section 124 provides that a permit could issue "notwithstanding any other provision of law." Therefore, the Secretary's denial on the grounds that granting DBOC a permit would "'would violate . . .' specific wilderness legislation" ER 0118, may be tested against this standard from Section 124.

NEPA also provides sufficient standards for judicial review. *See Pac. Rivers Council v. U.S. Forest Serv*., 689 F.3d 1012, 1020 (9th Cir. 2012) (judicial review

---

[6] The *Heckler* exception typically applies to enforcement-discretion cases—which this is not. *See Beaty v. FDA*, 853 F.Supp.2d 30, 39-40 (D.D.C. 2012) (*Heckler* presumption of unreviewability limited to agency decisions not to enforce or investigate); *see also Port of Seattle v. FERC*, 499 F.3d 1016, 1026-27 (9th Cir. 2007) (same).

of agency compliance with NEPA available under 5 U.S.C. § 706(2)(A)). This Court—and the district court—are well equipped to determine whether Defendants' decision to deny DBOC a SUP was made in violation of NEPA's requirements.

Defendants' regulations also provide sufficient standards for jurisdiction. *See KOLA, Inc. v. United States*, 882 F.2d 361, 364 (9th Cir. 1989) (reversing dismissal under § 701(a)(2) because standards provided in agency's regulations "[]bound" its discretion and "provide a basis for judicial review"). For example, Defendants have enacted regulations requiring a formal rulemaking before changing an area's use designation—as NPS did without rulemaking in its FR Notice on December 4, 2012. *See* 36 C.F.R. § 1.5(b); *see also Ft. Funston Dog Walkers et al. v. Babbitt*, 96 F. Supp. 2d 1021, 1039-40 (N.D. Cal. 2000) (granting motion for preliminary injunction to remedy NPS's failure to complete formal rulemaking under 36 C.F.R. § 1.5(b)); 36 C.F.R. § 1.6 (NPS permitting regulation).

The district court misapplied this Court's decision in *Ness Inv. Corp. v. U.S. Dep't. of Agric.*, 512 F.2d 706 (9th Cir. 1975). ER 0031. In *Ness*, there was "no law to apply" because NEPA was not at issue and the agency had no regulations that applied. *See id*. at 715-16. But the *Ness* Court itself recognized that "a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions." *Id*. at 715, 716-717 (finding whether NPS acted in conformity with applicable law in handling SUP

22

justiciable). Here, Section 124 applies, NEPA applies, and Defendants' regulations apply. Even under *Ness*, therefore, the district court had jurisdiction.

The district court suggested that Section 124's "notwithstanding" clause exempted Defendants' decision to deny the permit from all laws and regulations that might otherwise provide meaningful standards for review. *See* ER 0032 (concluding that Section 124 "granted authority 'notwithstanding any other provision of law,'" and rejecting DBOC's argument that Section 124 "operates unilaterally"). As noted in Section IX.A.1 above, Section 124 is an asymmetric statute enacted for DBOC's benefit, not Defendants'. But even if Congress had authorized the Secretary to issue *or deny* the permit notwithstanding any other provision of law, that would not be the end of the analysis.

When Congress does not specifically exempt an agency from compliance with a statute, but instead uses the "notwithstanding" formulation, the general rule is that existing law remains in place unless there is other convincing evidence that Congress intended the existing law to be displaced. *See United States v. Novak*, 476 F.3d 1041, 1052 (9th Cir. 2007) ("notwithstanding" clause will not displace existing law absent "other convincing indices of statutory intent"); *see also In re Glacier Bay*, 944 F.2d 577, 581-82 (9th Cir. 1991) (courts look carefully to see what Congress intended "notwithstanding" language to apply to). Here there are no indices of congressional intent to displace NEPA and all other laws and regulations in the event that the permit was denied. Without such indices of intent, Defendants cannot establish that Section 124's notwithstanding clause eliminates all otherwise applicable law or that the Secretary's decision is therefore unreviewable.

In fact, Congress did contemplate that a permit denial would have to comply with NEPA. In response to substantial public criticism of the "validity of the science" Defendants proffered in attempts to show that DBOC causes environmental harm, Congress directed the National Academy of Sciences to "assess the data, analysis, and conclusions" in that science, "in order to ensure there is a solid scientific foundation for the [FEIS] expected in mid-2012." H.R. Rep. No. 112-331, at 1057 (2011) (Conf. Rep.). This specific reference to the FEIS leaves no doubt that Congress expected the Secretary to comply with NEPA in the event of a permit denial and thus supports DBOC's interpretation of Section 124. *See Montana Wilderness Assoc. v. U.S. Forest Service*, 655 F.2d 951, 957 (9th Cir. 1981) (finding subsequent conference report "very persuasive" and "conclud[ing] that it tips the balance decidedly in favor" of appellants' interpretation of statute), citing *Seatrain Shipbuilding Corp. v. Shell Oil Co*., 444 U.S. 572, 596 (1980) (giving weight to House Report and noting that "while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, [citations], such views are entitled to significant weight").

The district court's ruling that Section 124 provided the Secretary with absolute, unreviewable discretion to deny the permit was error and should be reversed.

### B. DBOC Is Likely To Prevail On The Merits.

The district court also erred by finding that, even if judicial review were available, injunctive relief was not because DBOC had not established that it would prevail on the merits. But DBOC showed that Defendants misinterpreted the

24

law, violated NEPA, and unlawfully published a false notice in the Federal Register. The district court's conclusion that DBOC is not likely to prevail on the merits of its claims is based on erroneous interpretations of law that are reviewed de novo and should be reversed.

### 1. Defendants' Decision Was Based On Four Misinterpretations Of Law, In Violation Of The APA.

DBOC argued that it was likely to succeed on the merits of their APA claims because Defendants' Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of Section 706(2)(A) of the APA. ER 0634. Specifically, DBOC argued that Defendants' Decision was based on four misinterpretations of law—any one of which is sufficient to require invalidation of the decision. ER 0634-37; *see also SEC v. Chenery Corp*., 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law"). The district court erroneously concluded that DBOC "cannot establish . . . that they would ultimately be successful on the merits of their claim," ER 0038, by applying the wrong standard and reaching the wrong conclusion on each of the four misinterpretations of law by Defendants that DBOC identified.

First, Defendants misinterpreted Section 124 in concluding that issuing DBOC a new SUP would "violate" the law: "The continuation of the DBOC operation would violate . . . specific wilderness legislation for Point Reyes National Seashore." ER 0118; *see* ER 0123 (identifying the legislation as the 1976 Acts). But issuing the permit could not violate the law because Section 124 provided that Defendants were authorized to issue the permit notwithstanding any

other provision of law—as the Decision acknowledges. *See* Section IX.A.1 above.[7] This fundamental misinterpretation of the unambiguous language of Section 124 alone is sufficient to reverse the district court's Order and invalidate the Decision.

Second, the Secretary erroneously concluded that converting Drakes Estero to wilderness now "effectuates . . . Congressional intent" as expressed in the 1976 Acts. ER 0123. In fact, Congress specified that potential wilderness should *not* be classified as wilderness until all non-wilderness uses "have ceased." *Id.* (quoting Pub. L. No. 94-567, §3, 90 Stat. 2692). Here, all non-wilderness uses have not ceased. The State of California retains mineral and fishing rights. ER 0621-22. California has pledged to continue leasing Drakes Estero for shellfish cultivation. ER 0617 (CFGC letter stating that it "has clearly authorized" DBOC's shellfish cultivation "through at least 2029" in "the proper exercise of its jurisdiction"). And California reserves the right to dredge Drakes Estero for sand or other minerals at any time. ER 0621-22. As the Interior Department told Congress in 1976, California's "reserved rights" make Drakes Estero "inconsistent" with the

---

[7] Although the first page of the Decision states that issuing the permit would "violate" the law, the Decision later contradicts itself by acknowledging that Section 124 authorized the Secretary to issue the permit. ER 0123. Because the Decision is "internally inconsistent and inadequately explained" it is "arbitrary and capricious." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987). Similarly, the Secretary did not clarify or explain how he picked and chose among those parts of the FEIS that "informed" him and were "helpful," and those that were identified as "fatally flawed." ER 0122. *See Beno v. Shalala*, 30 F.3d 1057, 1075 (9th Cir. 1994) ("Stating that a factor was considered . . . is not a substitute for considering it.") (citations omitted).

definition of wilderness. ER 0257; *see also* ER 0237 (Drakes Estero should not convert to wilderness until the federal government gains "full title" to the area.). If Defendants did not believe that they had to have full title to Drakes Estero in order to convert it to wilderness, then the FR Notice purporting to convert the area to wilderness would not have stated (falsely) that "Drakes Estero is entirely in federal ownership." *See* Section IX.B.3 below.

More generally, Drakes Estero cannot become wilderness without substantial changes to the area's land uses because "wilderness" is defined as "an area where the earth and its community of life are untrammeled by man," and as "an area of undeveloped Federal land retaining its primeval character and influence. . . ." 16 U.S.C. § 1131(c). Drakes Estero, in contrast, hosts an oyster farm surrounded by other farms.[8] In truth, Defendants are trying to impose an artificial wilderness in the middle of a historic farming community in violation of the 1976 Acts.

Third, Defendants misinterpreted an act (the "1978 Act") that amended the 1964 Wilderness Act. The Decision stated that this "legislation does authorize the Secretary of the Interior to lease agricultural ranch and dairy lands within Point Reyes' pastoral zone in keeping with the historic use of that land . . . [but] does not authorize mariculture." ER 0119. In fact, the 1978 Act is *not* limited to "ranch and

---

[8] The Secretary's Decision makes clear that the cattle ranches in PRNS's pastoral zone are to be preserved. "Because of the importance of sustainable agriculture on the pastoral lands within Point Reyes, I direct that [NPS] pursue extending permits for the ranchers within those pastoral lands to 20-year terms." ER 0119.

dairy lands," but extends to all "agricultural land," which is defined as "lands which were in regular use for . . . *agricultural*, ranching, or dairying purposes as of May 1, 1978." 16 U.S.C. § 459c-5(a), (b) (emphasis added). The word "agricultural," if it is to have any meaning in this definition, must apply to lands used for something other than ranching or dairying purposes. The apparent candidate here is oyster farming. Drakes Estero has been home to an oyster farm since the 1930s. ER 0019. In California, "agriculture" includes aquaculture. Cal. Pub. Res. Code § 30100.2 ("Aquaculture products are agricultural products . . . ."); *see also Ass'n to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d 1007, 1016 (9th Cir. 2002) (Ninth Circuit refers to "shellfish farming" in Puget Sound). Thus Drakes Estero is "agricultural land," and the 1978 Act authorizes the Secretary to lease land for mariculture as long as that land was in regular use for mariculture as of May 1, 1978—a standard that DBOC easily meets. The Secretary made a legal error when he concluded otherwise.

Fourth, Defendants wrongly concluded that the "notwithstanding" clause of Section 124 exempted them from complying with NEPA and other laws for their decision to deny Plaintiffs a permit to continue operating. ER 0121. Congress intended to apply the "notwithstanding" clause to the issuance of a permit only; Section 124 says nothing about a denial. Section 124 did not excuse Defendants from complying with NEPA and other laws in their decision to deny the permit. See Section IX.A.1, above.

The district court did not respond to the first three of these arguments. Instead, it concluded that there was a "'rational connection' between the choices

made." ER 0036. But that test is not the only test agency action must pass. As noted above, agency actions cannot be based on misconceptions of the law. Defendants' actions were based on fundamental misconceptions of federal law, and DBOC's claims that those actions were thus unlawful are likely to prevail on the merits.[9]

### 2. Defendants Violated NEPA.

DBOC argued that Defendants' Decision violated NEPA. ER 0640-41. The district court concluded that NEPA did not apply because there was no jurisdiction. ER 034. Because it wrongly concluded that there was no jurisdiction, the district court failed to analyze whether DBOC was likely to prevail on the merits of its NEPA claim. But Defendants' decision to deny the SUP did violate NEPA.

Defendants do not dispute that, if NEPA applies to the denial (as it does), they did not comply with its basic procedural requirements.[10] That failure was an abuse of discretion and violation of law.

---

[9] The district court noted that the Secretary's Decision asserted that he "gave great weight to matters of public policy," i.e., the 1976 Acts. ER 0036; *see* ER 0122 ("I gave great weight to matters of public policy, particularly the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness"). But the Secretary did not actually weigh the policies Congress expressed in the 1976 Acts—instead, he made incorrect legal interpretations of those acts, of Section 124, and of the 1978 Act. ER 0122.

[10] Although Defendants initiated the NEPA process upon receiving DBOC's SUP application, ER 0022, they did not complete it. Defendants did not file the FEIS with EPA, as required by 40 C.F.R. § 1506.9. Because of this failure, EPA never published a notice of availability for the FEIS. NEPA regulations also specify that "[n]o decision on the proposed action shall be made" until 30 days after the publication of the notice of availability. 40 C.F.R. § 1506.10(b)(2). Likewise, the

Defendants also do not defend the FEIS. In response to the evidence that the FEIS relied on scientifically invalid data and conclusions, the Secretary asserted that his decision "was not based on flawed data," and the district court found that the dispute "cannot be resolved at this stage." ER 0038. The district court concluded that "policy decisions, not science, controlled the ultimate decision." *Id*. But NEPA prohibits decisions—including discretionary policy decisions—from being made based on defective data and junk science and without proper evaluation of their environmental consequences. *See S. Fork Band Council of W. Shoshone v. DOI*, 588 F.3d 718, 728 (9th Cir. 2009) (NEPA requires "careful consideration of environmental impacts" *before* a decision is made); *see also NRDC v. U.S. Forest Service*, 421 F.3d 797, 816 (9th Cir. 2005) (where misrepresentations and error in an EIS have "fatally infected its balance of economic and environmental considerations," the agency's ensuing decision is "arbitrary and capricious in violation of the APA").

In its congressionally mandated review, NAS articulated substantial criticisms of Defendants' conclusions. *See* Section VI above. Additionally, DBOC

---

Secretary did not issue a NEPA-compliant record of decision (ROD), as required by 40 C.F.R. § 1505.2. By failing to follow these procedural requirements, Defendants violated NEPA and the APA. *See, e.g., NRDC v. U.S. Forest Serv*., 421 F.3d 797, 813, 816 (9th Cir. 2005) (holding that agency EIS "violated NEPA's procedural requirement to present complete and accurate information" and was thus arbitrary and capricious); *see generally Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1099-1100 (9th Cir. 2010) (discussing importance and function of NEPA's procedural requirements).

has provided specific evidence of instances in which Defendants had relied on invalid data or reached invalid conclusions. For example, DBOC proved—and Defendants have never rebutted—that the FEIS altered the findings of the NPS-contracted harbor seal expert, increasing the number of DBOC-related seal disturbances from zero to two; claimed NPS could identify DBOC boat noise on days when DBOC boats were not operating; and grossly exaggerated DBOC equipment noise. ER 0633, 0638-39. Defendants did not counter that evidence. ER 0187, 0188; ER 0155-57.

NEPA requires agencies to take a "hard look" that "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011). "'Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.'" *Id.* (quoting 40 C.F.R. § 1500.1(b)). Defendants conspicuously failed to comply with these NEPA mandates. DBOC thereby established that it was likely to prevail on the merits of a NEPA claim.

### 3. Defendants Illegally Published A False Federal Register Notice.

DBOC argued that the FR Notice was false and published without the rulemaking required by Defendants' regulations. ER 0641-42. The district court found that DBOC had not shown "how the notice can be held patently false." ER 0036. The district court did not address DBOC's argument that the FR Notice was published without the required rulemaking. The district court erred because the FR Notice *is* patently false, in violation of law, and was published without the required

31

rulemaking. The false FR Notice—and its illegitimate designation of Drakes Estero as wilderness—should be invalidated.[11]

The FR Notice included two false statements of fact. *See Natural Res. Def. Council v. U.S. Forest Service*, 421 F.3d 797, 806 (9th Cir. 2005) (an "explanation that runs counter to the evidence" is an abuse of discretion). First, the FR Notice stated that "all uses prohibited under the Wilderness Act within Drakes Estero have ceased as of 11:59 p.m. on November 30, 2012." 77 Fed. Reg. at 71,827. This is untrue: commercial activities continued after that date—as specifically authorized by Defendants—including planting oyster seed in the waters of the estero and harvesting oysters. ER 0643-46; ER 0602-16. Second, the FR Notice stated that "Drakes Estero is entirely in federal ownership." 77 Fed. Reg. at 71,827. This is also false because California still retains the fishing and mineral rights in Drakes Estero, as well as the right to lease Drakes Estero for aquaculture.

The FR Notice also violated the law because Defendants published it without completing the formal rulemaking process their regulations require. Defendants' regulations require that any "closure, designation, use or activity restriction or condition" that significantly changes a park's public uses, or that is "highly controversial," "shall be published as rulemaking in the Federal Register." 36 C.F.R. § 1.5(b) (2013). This regulation applies because the FR Notice was the

---

[11] DBOC has standing to bring a claim regarding the publication of the false FR Notice because it will be necessary to vacate the unlawful notice in order for DBOC's injuries to be ultimately redressed.

result of Defendants' highly controversial decision to change the designation of Drakes Estero to wilderness and thereby restrict its uses. *See Ft. Funston Dog Walkers*, 96 F. Supp. 2d at 1022, 1039 (granting preliminary injunction to remedy NPS's failure to complete formal rulemaking before highly controversial decision to alter park usage). The failure to complete a formal rulemaking process before publishing the FR Notice violated the law and is also grounds to issue an injunction and vacate the notice.

DBOC has therefore established that it is likely to prevail on its claim that the FR Notice is patently false and published unlawfully.

### C. DBOC Will Suffer Irreparable Harm Without An Injunction.

The district court correctly found that DBOC will suffer irreparable harm without an injunction. ER 0041. DBOC is not challenging that finding. Implementation of the Decision would harm DBOC by causing the destruction of DBOC's entire crop—approximately 19 million immature oysters and 2 million immature clams, ER 0607; requiring DBOC to lay off its highly skilled and experienced workers who have irreplaceable skills necessary for aquaculture, ER 0612; erasing long-lasting commercial and personal relationships and intangible goodwill, ER 0612; and evicting DBOC from its unique and irreplaceable location, ER at 0615; ER 0180. This destruction of DBOC's business constitutes irreparable harm.[12]

---

[12] *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish

### D. The Balance Of Equities And Public Interest Favor An Injunction, And The District Court Erred When It Concluded Otherwise.

This Court "gives deference to motions panel decisions made in the course of the same appeal." *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1032 n.3 (9th Cir. 1990). This Court should thus defer to the motions panel's holding that "the balance of hardships tips sharply in [DBOC's] favor." ER 0125-26.

The district court erroneously concluded that the balance of the equities and public interest do not "weigh in favor" of the injunction. ER 0044.[13] Balancing of the equities is normally reviewed for abuse of discretion, but where, as here, the issues are of law, the decision is reviewed *de novo*. Section VIII, above. The balance of the equities and public interest strongly favor a continuation of the injunction issued by this Court.

---

irreparable harm."); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839, 841 (9th Cir. 2001) (threatened loss of customers and damage to business reputation and goodwill); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (damage to goodwill); *see also, e.g., Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011) (loss of a unique real property interest constitutes irreparable harm).

[13] Both sides presented evidence on the environmental and public impacts of keeping versus removing the oyster farm. But the district court did not base its analysis on that evidence. The district court concluded that it could not "determine, on the record before it," whether the supposed benefits of converting Drakes Estero to wilderness "weigh[ed] more strongly" than the public interest in maintaining the source of one-third of California's oyster production. ER 0044. It likewise held that it lacked a basis "to weigh the relative public interest" in avoidance of alleged environmental harm associated with DBOC's operations against the admitted environmental harm caused by removing the farm. *Id.*

The district court abused its discretion by failing to consider the public interest inherent in applicable federal law. ER 0044. A failure to consider the "public interest, as reflected in [an Act of Congress]" is "an abuse of discretion." *Motor Vessels Theresa Ann v. Kreps*, 548 F.2d 1382, 1382 (9th Cir. 1977); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (failure to consider the public interest, which "may be declared in the form of a statute," is reversible error)).

Here, the district court abused its discretion by failing to consider that no fewer than *four* acts of Congress weigh in favor of an injunction. First, the National Aquaculture Act of 1980 makes it "national policy" to "encourage the development of aquaculture" in the United States. 16 U.S.C. § 2801(b)–(c) (2012). Second, the 1978 Act authorized the Secretary to lease historically agricultural land in Point Reyes so that historical farming operations could continue indefinitely. 16 U.S.C. § 459c-5(a)–(b). Third, Section 124 was intended to ease issuance of a permit, not a denial—as Defendants admit. ER 0276; *see also* ER 0127-28. Fourth, under NEPA, "the public interest requires careful consideration of environmental impacts" *before* a decision is made—and here Defendants violated NEPA. *S. Fork Band Council of W. Shoshone*, 588 F.3d at 728.[14]

---

[14] NEPA, like other statutes requiring agencies to carefully examine accurate information before acting, safeguards the public's confidence in government decisionmaking. It is emphatically in the public interest that its "government operates effectively and fairly" so that "public confidence in government is not undermined . . . ." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 230 n.27 (1977). Defendants' casual and repeated disregard for both NEPA's procedural

Remedying that violation is in the public interest. *See Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("'[I]t is obvious that compliance with the law is in the public interest'") (citation omitted).

The district court also fundamentally misapprehended the legal relevance of Section 124 and thus gave weight to an inappropriate factor. In finding that the public interest and balance of the equities did not favor injunctive relief, the district court invoked the 2005 communications from NPS to DBOC regarding the agency's position that the 1976 Acts prohibited Defendants from issuing a new SUP after the original authorization expired in 2012. ER 0044. The district court weighed against DBOC its alleged "failure to conduct due diligence . . . [about] the Park Service['s] intention to allow the Reservation to lapse in November 2012, and the Company's failure to prepare for the same." *Id*. But this was error because the purchase of the farm and NPS's expressions of intent to allow the existing permit to expire occurred prior to the game-changing enactment of Section 124, which was intended to (and should have) completely superseded any legal conclusions or positions based on the previous statutory backdrop.[15] *See Cadence Design Sys. v.*

---

requirements and the truth, *see* Section IX.B.2 above, highlights how the public interest in sound science and informed decisionmaking has been disregarded in this case.

[15] For the same reason, the district court erred when it concluded that the reference in the House Report accompanying the 1976 Acts about "remov[ing] obstacles" to the conversion of potential wilderness areas to wilderness areas was an "important consideration" weighing against an injunction. ER 0044. This analysis ignores the Interior Department's 1976 testimony to Congress that California's retained rights make the area "inconsistent" with wilderness, as well as the Senate Report, which

*Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (improper consideration of a factor in balancing of equities is reversible error). It is undisputed that Section 124 authorized the Secretary to issue a new SUP that would allow DBOC to continue operations for ten years under the same terms as its original permit. ER 0032. DBOC had a pending SUP application for over two years, until Secretary Salazar denied the application on November 29, 2012. ER 0044. For the district court to hold against DBOC a "refusal to hear the message" from Defendants that no SUP could issue, when that message had been explicitly overruled by Congress, is reversible error.

## X.    CONCLUSION

The district court's Order should be reversed and the injunction issued by this Court should remain in effect pending resolution of this case on the merits.

---

says that Drakes Estero will not convert to wilderness until the federal government gains "full title" to the area. Even the legislative history of the 1976 Acts, therefore, supports DBOC. Furthermore, because Defendants were prohibited from converting Drakes Estero from "potential wilderness" to wilderness, it was error for the district court to weigh such a conversion in the balancing of equities and the public interest. But even if the district court's interpretation of the 1976 Acts were correct, the district court erred by failing to consider that Section 124 superseded that interpretation.

DATED: March 6, 2013

Respectfully submitted,

CAUSE OF ACTION

By: */s/ Amber Abbasi*
    AMBER D. ABBASI

BRISCOE IVESTER & BAZEL LLP

By: */s/ Peter Prows*
    PETER PROWS

STOEL RIVES LLP

By: */s/ Ryan Waterman*
    RYAN WATERMAN

Attorneys for Plaintiff-Appellants

**CIRCUIT RULE 28-2.6 STATEMENT OF RELATED CASES**

Plaintiffs-Appellants state that there is a related case on file in this Court, to wit, *Drakes Bay Oyster Company, et al v. Environmental Action Committee, et al*, Case No. 13-15390, which arises out of the same district court case and addresses the question of whether the district court erred in denying the motion to intervene of the Environmental Action Committee of West Marin, Save Our Seashore, Natural Resources Defense Council, and National Parks Conservation Association.

## RULE 32 CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

✓ this brief contains 10,002 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

__ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

✓ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Times New Roman 14 point, or

__ this brief has been prepared in a monospaced spaced typeface using _____ with _____.

DATED: March 6, 2013                         _/s/  Amber Abbasi_
                                             AMBER ABBASI
                                             Attorney for Plaintiff-Appellants

40

[This page intentionally left blank]

# STATUTORY ADDENDUM

**Statutes**

5 U.S.C. § 701 ..................................................................................2

5 U.S.C. § 704 ..................................................................................2

5 U.S.C. § 706 ..................................................................................3

16 U.S.C. § 459c-5 ...........................................................................3

16 U.S.C. § 1131 ..............................................................................5

16 U.S.C. § 2801 ..............................................................................7

1965 Cal. Stat. Ch. 983 ....................................................................8

Cal. Pub. Res. Code § 30100.2 ........................................................9

Pub. L. No. 87-657 ...........................................................................9

Pub. L. No. 111-88 § 124 ...............................................................14

**Regulations**

36 C.F.R. § 1.5 ...............................................................................14

36 C.F.R. § 1.6 ...............................................................................15

40 C.F.R. § 1500.1 .........................................................................16

40 C.F.R. § 1500.2 .........................................................................17

40 C.F.R. § 1506.9 .........................................................................18

40 C.F.R. § 1506.10 .......................................................................18

**Other**

H.R. Rep. No. 112-331 ...................................................................19

## 5 U.S.C § 701 - Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—

> (1) statutes preclude judicial review; or

> (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

> (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

>> (A) the Congress;

>> (B) the courts of the United States;

>> (C) the governments of the territories or possessions of the United States;

>> (D) the government of the District of Columbia;

>> (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

>> (F) courts martial and military commissions;

>> (G) military authority exercised in the field in time of war or in occupied territory; or

>> (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641 (b)(2), of title 50, appendix; and

> (2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

## 5 U.S.C. § 704 - Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly

reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 5 U.S.C. § 706 - Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> (D) without observance of procedure required by law;

>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 16 U.S.C. § 459c–5 - Owner's reservation of right of use and occupancy for fixed term of years or life

(a) Election of term; fair market value; termination; notification; lease of Federal lands: restrictive covenants, offer to prior owner or leaseholder

Except for property which the Secretary specifically determines is needed for interpretive or resources management purposes of the seashore, the owner of improved property or of agricultural property on the date of its acquisition by the Secretary under sections 459c to 459c–7 of this title may, as a condition of such acquisition, retain for himself and his or her heirs and assigns a right of use and occupancy for a definite term of not more than twenty-five years, or, in lieu thereof, for a term ending at the death of the owner or the death of his or her spouse, whichever is later. The owner shall elect the term to be reserved. Unless the property is wholly or partly donated to the United States, the Secretary shall pay to the owner the fair market value of the property on the date of acquisition minus the fair market value on that date of the right retained by the owner. A right retained pursuant to this section shall be subject to termination by the Secretary upon his or her determination that it is being exercised in a manner inconsistent with the purposes of sections 459c to 459c–7 of this title, and it shall terminate by operation of law upon the Secretary's notifying the holder of the right of such determination and tendering to him or her an amount equal to the fair market value of that portion of the right which remains unexpired. Where appropriate in the discretion of the Secretary, he or she may lease federally owned land (or any interest therein) which has been acquired by the Secretary under sections 459c to 459c–7 of this title, and which was agricultural land prior to its acquisition. Such lease shall be subject to such restrictive covenants as may be necessary to carry out the purposes of sections 459c to 459c–7 of this title. Any land to be leased by the Secretary under this section shall be offered first for such lease to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States.

(b) "Improved and agricultural property" defined

As used in sections 459c to 459c–7 of this title, the term "improved property" shall mean a private noncommercial dwelling, including the land on which it is situated, whose construction was begun before September 1, 1959, or, in the case of areas added by action of the Ninety-fifth Congress, May 1, 1978 or, in the case of areas added by action of the Ninety-sixth Congress, May 1, 1979, and structures accessory thereto (hereinafter in this subsection referred to as "dwelling"), together with such amount and locus of the property adjoining and in the same ownership as such dwelling as the Secretary designates to be reasonably necessary for the enjoyment of such dwelling for the sole purpose of noncommercial residential use and occupancy. In making such designation the Secretary shall take into account

the manner of noncommercial residential use and occupancy in which the dwelling and such adjoining property has usually been enjoyed by its owner or occupant. The term "agricultural property" as used in sections 459c to 459c–7 of this title means lands which were in regular use for, or were being converted to agricultural, ranching, or dairying purposes as of May 1, 1978 or, in the case of areas added by action of the Ninety-sixth Congress, May 1, 1979, together with residential and other structures related to the above uses of the property that were in existence or under construction as of May 1, 1978.

(c) Payment deferral; scheduling; interest rate

In acquiring those lands authorized by the Ninety-fifth Congress for the purposes of sections 459c to 459c–7 of this title, the Secretary may, when agreed upon by the landowner involved, defer payment or schedule payments over a period of ten years and pay interest on the unpaid balance at a rate not exceeding that paid by the Treasury of the United States for borrowing purposes.

(d) Lands donated by State of California

The Secretary is authorized to accept and manage in accordance with sections 459c to 459c–7 of this title, any lands and improvements within or adjacent to the seashore which are donated by the State of California or its political subdivisions. He is directed to accept any such lands offered for donation which comprise the Tomales Bay State Park, or lie between said park and Fish Hatchery Creek. The boundaries of the seashore shall be changed to include any such donated lands.

(e) Fee or admission charge prohibited

Notwithstanding any other provision of law, no fee or admission charge may be levied for admission of the general public to the seashore.


## 16 U.S.C. § 1131 - National Wilderness Preservation System

(a) Establishment; Congressional declaration of policy; wilderness areas; administration for public use and enjoyment, protection, preservation, and gathering and dissemination of information; provisions for designation as wilderness areas

In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future

generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

(b) Management of area included in System; appropriations

The inclusion of an area in the National Wilderness Preservation System notwithstanding, the area shall continue to be managed by the Department and agency having jurisdiction thereover immediately before its inclusion in the National Wilderness Preservation System unless otherwise provided by Act of Congress. No appropriation shall be available for the payment of expenses or salaries for the administration of the National Wilderness Preservation System as a separate unit nor shall any appropriations be available for additional personnel stated as being required solely for the purpose of managing or administering areas solely because they are included within the National Wilderness Preservation System.

(c) "Wilderness" defined

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which

(1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable;

(2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation;

(3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and

(4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

## 16 USC § 2801 - Congressional findings, purpose, and policy

(a) Findings

Congress finds the following:

(1) The harvest of certain species of fish and shellfish exceeds levels of optimum sustainable yield, thereby making it more difficult to meet the increasing demand for aquatic food.

(2) To satisfy the domestic market for aquatic food, the United States imports more than 50 per centum of its fish and shellfish, but this dependence on imports adversely affects the national balance of payments and contributes to the uncertainty of supplies.

(3) Although aquaculture currently contributes approximately 13 percent of world seafood production, less than 6 percent of current United States seafood production results from aquaculture. Domestic aquacultural production, therefore, has the potential for significant growth.

(4) Aquacultural production of aquatic plants can provide sources of food, industrial materials, pharmaceuticals, and energy, and can assist in the control and abatement of pollution.

(5) The rehabilitation and enhancement of fish and shellfish resources are desirable applications of aquacultural technology.

(6) The principal responsibility for the development of aquaculture in the United States must rest with the private sector.

(7) Despite its potential, the development of aquaculture in the United States has been inhibited by many scientific, economic, legal, and production factors, such as inadequate credit, diffused legal jurisdiction, the lack of management information, the lack of supportive Government policies, and the lack of reliable supplies of seed stock.

(8) Many areas of the United States are suitable for aquaculture, but are subject to land-use or water-use management policies that do not adequately consider the potential for aquaculture and may inhibit the development of aquaculture.

(b) Purpose

It is the purpose of this chapter to promote aquaculture in the United States by—

(1) declaring a national aquaculture policy;

(2) establishing and implementing a national aquaculture development plan;

(3) establishing the Department of Agriculture as the lead Federal agency with respect to the coordination and dissemination of national aquaculture information by designating the Secretary of Agriculture as the permanent chairman of the coordinating group and by establishing a National Aquaculture Information Center within the Department of Agriculture; and

(4) encouraging aquaculture activities and programs in both the public and private sectors of the economy;

that will result in increased aquacultural production, the coordination of domestic aquaculture efforts, the conservation and enhancement of aquatic resources, the creation of new industries and job opportunities, and other national benefits.

(c) Policy

Congress declares that aquaculture has the potential for reducing the United States trade deficit in fisheries products, for augmenting existing commercial and recreational fisheries and for producing other renewable resources, thereby assisting the United States in meeting its future food needs and contributing to the solution of world resource problems. It is, therefore, in the national interest, and it is the national policy, to encourage the development of aquaculture in the United States.


## 1965 Cal. Stat. Ch. 983 - An act to convey certain tide and submerged lands to the United States in furtherance of the Point Reyes National Seashore.

The people of the State of California do enact as follows:

SECTION 1. There is hereby granted to the United States, subject to the limitations which are described in Section 2 of this act, all of the right, title, and interest of the State of California, held by the state by virtue of its sovereignty in and to all of the tide and submerged lands or other lands beneath navigable waters situated within the boundaries of the Point Reyes National Seashore which the Secretary of the Interior is authorized to establish by authority of Public Law 87-657, 76 Stat. 538, and as such boundaries exist on the effective date of this act.

SEC. 2. There is hereby excepted and reserved to the State all deposits of minerals, including oil and gas, in the lands, and to the state, or persons authorized by the state, the right to prospect for, mine, and remove such deposits from the lands;

provided, that no well or drilling operations of any kind shall be conducted upon the surface of such lands.

SEC. 3. There is hereby reserved to the people of the state the right to fish in the waters underlying the lands described in Section 1.

SEC. 4. If the United States ceases to use the lands for public purposes, all right, title and interest of the United States in and to such lands shall cease and the lands shall revert and rest in the state.

SEC. 5. The United States shall survey and monument the granted lands and record a description and plat thereof in the office of the County Recorder of Marin County.

## Cal Pub Resources Code § 30100.2 - "Aquaculture"

"Aquaculture" means a form of agriculture as defined in Section 17 of the Fish and Game Code. Aquaculture products are agricultural products, and aquaculture facilities and land uses shall be treated as agricultural facilities and land uses in all planning and permit-issuing decisions governed by this division.

## Public Law 87-657

## September l3, 1962 - An Act to establish the Point Reyes National Seashore in the State of California, and for other purposes.

Be it enacted by the Senate and House of Representatives of the California. United States of America in Congress assembled, That in order to preserve, for purposes of public recreation, benefit, and Establishment, inspiration, a portion of the diminishing seashore of the United States that remains undeveloped, the Secretary of the Interior (hereinafter referred to as the "Secretary") is hereby authorized to take appropriate action in the public interest toward the establishment of the national seashore set forth in section 2 of this Act.

SEC. 2. (a) The area comprising that portion of the land and waters located on Point Reyes Peninsula, Marin County, California, which shall be known as the Point Reyes National Seashore, is described as follows by reference to that certain boundary map, designated N S PR-7001, dated June 1, 1960, oh file with the Director, National Park Service, Washington, District of Columbia. Beginning at a point, not monumented, where the boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines meets the average high tide line of the Pacific Ocean as shown on said boundary map; Thence southwesterly from said

point 1,320 feet offshore on a prolongation of said boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines; Thence in a northerly and westerly direction paralleling the average high tide line of the shore of the Pacific Ocean; along Drakes Bay, and around Point Reyes; Thence generally northerly and around Tomales Point, offshore a distance of 1,320 feet from average high tide line; Thence southeasterly along a line 1,320 feet offshore and parallel to the average high tide line along the west shore of Bodega Bay and Tomales Bay to the intersection of this line with a prolongation of the most northerly tangent of the boundary of Tomales Bay State P a r k; Thence south 54 degrees 32 minutes west 1,320 feet along the prolongation of said tangent of Tomales Bay State Park boundary to the average high tide line on the shore of Tomales Bay; Thence following the boundary of Tomales Bay State Park in a southerly direction to a point lying 105.4 feet- north 41 degrees east of an unimproved road heading westerly and northerly from Pierce Point Road; Thence south 41 degrees west 105.4 feet to a point on the north right-of-way of said unimproved road; Thence southeasterly along the north right-of-way of said unimproved road and Pierce Point Road to a point at the southwest corner of Tomales Bay State Park at the junction of the Pierce Point Road and Sir Francis Drake Boulevard; Thence due south to a point on the south right-of-way of said Sir Francis Drake Boulevard; Thence southeasterly along said south right-of-way approximately 3,100 feet to a point; Thence approximately south 19 degrees west approximately 300 feet: Thence south approximately 400 feet; Thence southwest to the most northerly corner of the Inverness watershed area; Thence southerly and easterly along the west property line of the Inverness watershed area approximately 9,040 feet to a point near the intersection of this property line with an unimproved road as shown on said boundary map; Thence southerly along existing property lines that roughly follow said unimproved road to its intersection with Drakes Summit Road and to a point on the north right-of-way of Drakes Summit Road; Thence easterly approximately 1,000 feet along the north right-of-way of said Drakes Summit Road to a point which is a property line corner at the intersection with an unimproved road to the south; Thence southerly and easterly and then northerly, as shown approximately on said boundary map, along existing property lines to a point on the south right-of-way of the Bear Valley Road, approximately 1,500 feet southeast of its intersection with Sir Francis Drake Boulevard; Thence easterly and southerly along said south right-of-way of Bear Valley Road to a point on a property line approximately 1,000 feet west of the intersection of Bear Valley Road and Sir Francis Drake Boulevard in the village of Olema; Thence south approximately 1,700 feet to the northwest corner of property now owned by Helen U. and Mary S. Shafter; Thence southwest and southeast along the west boundary of said Shafter property to the southwest corner of said Shafter property; Thence

approximately south 30 degrees east on a course approximately 1,700 feet to a point; Thence approximately south 10 degrees east on a course to the centerline of Olema Creek; Thence generally southeasterly up the centerline of Olema Creek to a point on the west right-of-way line of State Route Numbered 1; Thence southeasterly along westerly right-of-way line to State Highway Numbered 1 to a point where a prolongation of the boundary line common to Rancho Punta de los Reyes (Sobrante) and Rancho Las Baulines would intersect right-of-way line of State Highway Numbered 1; Thence southwesterly to and along said south boundary line of Rancho Punta de los Reyes (Sobrante) approximately 2,900 feet to a property corner; Thence approximately south 38 degrees east approximately 1,500 feet to the centerline of Pine Gulch Creek; Thence down the centerline of Pine Gulch Creek approximately 400 feet to the intersection with a side creek flowing from the west; Thence up said side creek to its intersection with said south boundary line of Rancho Punta de los Reyes (Sobrante); Thence southwest along said south boundary line of Rancho Punta de los Reyes to the point of beginning, containing approximately 53,000 acres. Notwithstanding the foregoing description^ the Secretary is authorized to include within the Point Reyes National Seashore the entire tract of land owned by the Vedanta Society of Northern California west of the centerline of Olema Creek, in order to avoid a severance of said tract. (b) The area referred to in subsection (a) shall include also a right-of-way, to be selected by the Secretary, of not more than 400 feet in width to the aforesaid tract from the intersection of Sir Francis Drake Boulevard and Haggerty Gulch.

SEC. 3. (a) Except as provided in section 4, the Secretary is authorized to acquire, and it is the intent of Congress that he shall acquire as rapidly as appropriated funds become available for this purpose or as such acquisition can be accomplished by donation or with donated funds or by transfer, exchange, or otherwise the lands, waters, and other property, and improvements thereon and any interest therein, within the areas described in section 2 of this Act or which lie within the boundaries of the seashore as established under section 5 of this Act (hereinafter referred to as "such area"). Any property, or interest therein, owned by a State or political subdivision thereof may be acquired only with the concurrence of such owner. Notwithstanding any other provision of law, any Federal property located within such area may, with the concurrence of the agency having custody thereof, be transferred without consideration to the administrative jurisdiction of the Secretary for use by him in carrying out the provisions of this Act. In exercising his authority to acquire property in accordance with the provisions of this subsection, the Secretary may enter into contracts requiring the expenditure, when appropriated, of funds authorized by section 8 of this Act, but the liability of

the United States under any such contract shall be contingent on the appropriation of funds sufficient to fulfill the obligations thereby incurred. (b) The Secretary is authorized to pay for any acquisitions which he makes by purchase under this Act their fair market value, as determined by the Secretary, who may in his discretion base his determination on an independent appraisal obtained by him. (c) In exercising his authority to acquire property by exchange, the Secretary may accept title to any non-Federal property located within such area and convey to the grantor of such property any federally owned property under the jurisdiction of the Secretary within California and adjacent States, notwithstanding any other provision of law. The properties so exchanged shall be approximately equal in fair market value, provided that the Secretary may accept cash from or pay cash to the grantor in such an exchange in order to equalize the values of the properties exchanged.

SEC. 4. No parcel of more than five hundred acres within the zone of approximately twenty-six thousand acres depicted on map numbered NS-PR-7002, dated August 15, 1961, on file with the director. National Park Service, Washington, District of Columbia, exclusive of that land required to provide access for purposes of the national seashore, shall be acquired without the consent of the owner so long as it remains in its natural state, or is used exclusively for ranching and dairying purposes including housing directly incident thereto. The term "ranching and dairying purposes", as used herein, means such ranching and dairying, primarily for the production of food, as is presently practiced in the area. In acquiring access roads within the pastoral zone, the Secretary shall give due consideration to existing ranching and dairying uses and shall not unnecessarily interfere with or damage such use.

SEC. 5. (a) As soon as practicable after the date of enactment of this Act and following the acquisition by the Secretary of an acreage in the area described in section 2 of this Act, that is in the opinion of the Secretary efficiently administrable to carry out the purposes of this Act, the Secretary shall establish Point Reyes National Seashore by the publication of notice thereof in the Federal Register. (b) Such notice referred to in subsection (a) of this section shall contain a detailed description of the boundaries of the seashore which shall encompass an area as nearly as practicable identical to the area described in section 2 of this Act. The Secretary shall forthwith after the date of publication of such notice in the Federal Register (1) send a copy of such notice, together with a map showing such boundaries, by registered or certified mail to the Governor of the State and to the governing body of each of the political subdivisions involved; (2) cause a copy of such notice and map to be published in one or more newspapers which circulate in each of the localities; and (3) cause a certified copy of such notice, a copy of such

map, and a copy of this Act to be recorded at the registry of deeds for the county involved.

SEC. 6. (a) Any owner or owners (hereinafter in this subsection referred to as "owner") of improved property on the date of its acquisition by the Secretary may, as a condition to such acquisition, retain the right of use and occupancy of the improved property for noncommercial residential purposes for a term of fifty years. The Secretary shall pay to the owner the fair market value of the property on the date of such acquisition less the fair market value on such date of the right retained by the owner. (b) As used in this Act, the term "improved property" shall mean a private noncommercial dwelling, including the land on which it is situated, whose construction was begun before September 1, 1959, and structures accessory thereto (hereinafter in this subsection referred to as "dwelling"), together with such amount and locus of the property adjoining and in the same ownership as such dwelling as the Secretary designates to be reasonably necessary for the enjoyment of such dwelling for the sole purpose of noncommercial residential use and occupancy. In making such designation the Secretary shall take into account the manner of noncommercial residential use and occupancy in which the dwelling and such adjoining property has usually been enjoyed by its owner or occupant.

SEC. 7. (a) Except as otherwise provided in this Act, the property acquired by the Secretary under this Act shall be administered by the Secretary, subject to the provisions of the Act entitled "An Act to establish a National Park Service, and for other purposes", approved August 25, 1916 (39 Stat. 535), as amended and supplemented, and in accordance with other laws of general application relating to the national park system as defined by the Act of August 8, 1953 (67 Stat, 496), except that authority otherwise available to the Secretary for the conservation and management of natural resources may be utilized to the extent he finds such authority will further the purposes of this Act. (b) The Secretary may permit hunting and fishing on lands and waters under his jurisdiction within the seashore in such areas and under such regulations as he may prescribe during open seasons prescribed by applicable local, State, and Federal law. The Secretary shall consult with officials of the State of California and any political subdivision thereof who have jurisdiction of hunting and fishing prior to the issuance of any such regulations, and the Secretary is authorized to enter into cooperative agreements with such officials regarding such hunting and fishing as he may deem desirable.

SEC. 8. There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act, except that no more than $14,000,000 shall be appropriated for the acquisition of land and waters and improvements thereon, and

interests therein, and incidental costs relating thereto, in accordance with the provisions of this Act.

## Pub. L. No. 111-88 § 124

Prior to the expiration on November 30, 2012 of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit (''existing authorization'') within Drake's Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: Provided, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

## 36 CFR 1.5

### § 1.5 Closures and public use limits.

(a) Consistent with applicable legislation and Federal administrative policies, and based upon a determination that such action is necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities, the superintendent may:

(1) Establish, for all or a portion of a park area, a reasonable schedule of visiting hours, impose public use limits, or close all or a portion of a park area to all public use or to a specific use or activity.

(2) Designate areas for a specific use or activity, or impose conditions or restrictions on a use or activity.

(3) Terminate a restriction, limit, closure, designation, condition, or visiting hour restriction imposed under paragraph (a)(1) or (2) of this section.

(b) Except in emergency situations, a closure, designation, use or activity restriction or condition, or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature, shall be published as rulemaking in the Federal Register.

(c) Except in emergency situations, prior to implementing or terminating a restriction, condition, public use limit or closure, the superintendent shall prepare a written determination justifying the action. That determination shall set forth the reason(s) the restriction, condition, public use limit or closure authorized by paragraph (a) has been established, and an explanation of why less restrictive measures will not suffice, or in the case of a termination of a restriction, condition, public use limit or closure previously established under paragraph (a), a determination as to why the restriction is no longer necessary and a finding that the termination will not adversely impact park resources. This determination shall be available to the public upon request.

(d) To implement a public use limit, the superintendent may establish a permit, registration, or reservation system. Permits shall be issued in accordance with the criteria and procedures of § 1.6 of this chapter.

(e) Except in emergency situations, the public will be informed of closures, designations, and use or activity restrictions or conditions, visiting hours, public use limits, public use limit procedures, and the termination or relaxation of such, in accordance with § 1.7 of this chapter.

(f) Violating a closure, designation, use or activity restriction or condition, schedule of visiting hours, or public use limit is prohibited.


## 36 CFR 1.6

### § 1.6 Permits.

(a) When authorized by regulations set forth in this chapter, the superintendent may issue a permit to authorize an otherwise prohibited or restricted activity or impose a public use limit. The activity authorized by a permit shall be con-sistent with applicable legislation, Federal regulations and administrative policies, and based upon a determination that public health and safety, environmental or scenic

values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted.

(b) Except as otherwise provided, application for a permit shall be submitted to the superintendent during normal business hours.

(c) The public will be informed of the existence of a permit requirement in accordance with § 1.7 of this chapter.

(d) Unless otherwise provided for by the regulations in this chapter, the superintendent shall deny a permit that has been properly applied for only upon a determination that the designated capacity for an area or facility would be exceeded; or that one or more of the factors set forth in paragraph (a) of this section would be adversely impacted. The basis for denial shall be provided to the applicant upon request.

(e) The superintendent shall include in a permit the terms and conditions that the superintendent deems necessary to protect park resources or public safety and may also include terms or conditions established pursuant to the authority of any other section of this chapter.

(f) A compilation of those activities requiring a permit shall be maintained by the superintendent and available to the public upon request.

(g) The following are prohibited:

(1) Engaging in an activity subject to a permit requirement imposed pursuant to this section without obtaining a permit; or

(2) Violating a term or condition of a permit issued pursuant to this section.

(h) Violating a term or condition of a permit issued pursuant to this section may also result in the suspension or revocation of the permit by the superintendent.


**40 CFR 1500.1**

### § 1500.1 Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to

comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

 (b) NEPA procedures must insure that environmental information is available to public officials and citizens be-fore decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

 (c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to gen-erate paperwork--even excellent paperwork--but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.


**40 CFR 1500.2**

 **§ 1500.2 Policy.**

  Federal agencies shall to the fullest extent possible:

 (a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

 (b) Implement procedures to make the NEPA process more useful to decision-makers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

 (c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

 (d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

 (e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## 40 CFR 1506.9

### § 1506.9 Filing requirements.

(a) Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Mail Code 2252-A, Room 7220, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This address is for deliveries by US Postal Service (including USPS Express Mail).

(b) For deliveries in-person or by commercial express mail services, including Federal Express or UPS, the correct address is: US Environmental Protection Agency, Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Room 7220, 1200 Pennsylvania Avenue, NW., Washington, DC 20004.

(c) Statements shall be filed with the EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10.

## 40 CFR 1506.10

### § 1506.10 Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see § 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

## H.R. Rep. No. 112-331, at 1057 (2011)

Point Reyes National Seashore.--The conferees are aware that the Service will shortly be issuing a Draft Environmental Impact Statement (DEIS) regarding a possible 10-year extension for oyster operations at Point Reyes National Seashore.

Because of concerns relating to the validity of the science underlying the DEIS, the conferees direct the National Academy of Sciences to assess the data, analysis, and conclusions in the DEIS in order to ensure there is a solid scientific foundation for the Final Environmental Impact Statement expected in mid-2012.

| 9th Circuit Case Number(s) | 13-15227 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Mar 6, 2013 .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Zachary Robert Walton
SSL Law Firm LLP
Suite 2700
575 Market Street
San Francisco, CA 94105

Signature (use "s/" format) s/ Peter Prows